IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **CELSO ROBLEDO, MARIA ROBLEDO, MANUEL ROBLEDO, WALTER KOPEC, and JEFFREY MARTIN, on behalf of themselves and others similarly situated** | ) ) ) ) ) ) ) ) ) ) ) ) | No. 05 C 335 |
| Plaintiffs, | | |
| v. | | |
| **CITY OF CHICAGO, a municipal corporation,** | | |
| Defendant. | | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This case has proceeded down a long and sinuous trajectory since its inception more than six years ago, when plaintiffs sued the City on behalf of a class, alleging constitutional and state law violations arising out of the disposition of their vehicles pursuant to the City's policy of progressive penalties for parking infractions. Plaintiffs contend that the final step in the City's "boot-tow-disposition" policy (the "Policy"), in which vehicles whose owners have not paid outstanding fines, fees, and costs associated with parking violations are sold or otherwise disposed of, violates their procedural due process rights and is irreconcilable with Illinois' law of takings and bailment.[1] The constitutional theory

---

[1]Plaintiffs initially asserted other constitutional and state law claims, but these are the only claims that survived my order of August 9, 2006, partially granting defendant's motion to

1

plaintiffs invoke has evolved over time, and the pending cross-motions for summary judgment reflect a very different due process claim than the one I concluded withstood the City's attacks at previous stages of this litigation. For the reasons discussed below, their present constitutional claim cannot survive summary judgment. I therefore grant the City's motion as to this claim. In addition, because it is clear from the record that plaintiffs' state law claims cannot survive, I enter judgment for the City on these claims as well. Plaintiffs' summary judgment motion is denied in its entirety.

I.

The material facts in the case are undisputed, though the parties focus on very different portions of the record. Naturally, plaintiffs emphasize the tribulations the named plaintiffs endured in their late-stage attempts to secure the release of their impounded vehicles--ordeals that culminated in the discovery that their vehicles had been "disposed of" (which, to be clear, is the City's generic phrase for sold or destroyed). The City, meanwhile, focuses on the long series of events leading up to the impoundment of these vehicles: serial parking violations giving rise to numerous ignored tickets (as many as twenty-four in the Robledos' case), and repeated warnings, also unheeded, about the consequences of accumulating unpaid, uncontested parking violations. More on these facts later; first, a description of the City's Policy.

---

dismiss. *Robledo v. City of Chicago*, 444 F. Supp. 2d 895 (N.D. Ill. 2006).

Pursuant to the City's Policy for the administrative adjudication of violations of parking ordinances, which is set forth in the Municipal Code of Chicago § 9-100-010 et. seq., the City imposes progressive penalties for parking infractions. The process begins when notice of a parking violation (i.e., a "ticket") is affixed to the offending vehicle. The ticket itself informs the vehicle's owner of the nature of the violation, as well as of the owner's right to challenge the violation at an administrative hearing. The ticket also informs the owner that she has fourteen days in which to pay the ticket or to request a hearing, and that failure to take one of these actions will result in a determination of liability against her. Notice of any resulting determination of liability is then sent to the owner via first class mail. That notice informs the owner of a further opportunity to request a hearing to petition the City to set aside the determination of liability.

After a vehicle owner has incurred three final determinations of liability for parking violations, a notice of "impending vehicle immobilization" is sent to the owner, which identifies the underlying, unpaid parking violations, and which informs the owner that failure to pay the fines and penalties associated with these violations within twenty-one days will result in the placement of the ticketed vehicle (or other vehicles registered to the owner) on an "immobilization list." This notice also states that the owner may request a hearing to challenge the impending immobilization. In the

event a vehicle is actually immobilized (i.e., "booted"), another notice is affixed to the vehicle that again informs the owner of her right to request a hearing to challenge immobilization. After a vehicle is booted, the owner has twenty-four hours to pay (or successfully to challenge at a hearing) the underlying violations; otherwise, the City directs a third party--an entity the parties refer to for the purposes of this litigation as "United Towing"--to tow and impound the vehicle.

Once a vehicle is impounded, the City sends an Impoundment Notice to the owner via certified mail within two or three days.[2] The information provided in this Impoundment Notice has been amended during the pendency of this lawsuit. At the time of filing, the notice stated, among other things, that "[t]o secure the release of the vehicle, the registered owner or his authorized agent must appear at the pound location listed above and present (1) a certificate of title or current state license registration card documenting ownership and (2) a release order which may be obtained at the Office of the Department of Revenue at any of the following locations. ..." Pl.'s SOF, Exh. F at RB000095. The Impoundment Notice also provided (and still provides) a telephone number at which additional information could be obtained, and informed (and still informs) the owner that he or she was entitled to an administrative hearing to

---

[2]The parties agree that in most cases, by the time the owner receives the Impoundment Notice, he has already called the City seeking information about his vehicle. There is no dispute, however, that the information City employees provide by phone is the same as that provided in the Impoundment Notice.

determine whether the immobilization, towing, or impoundment was erroneous. *Id*. The final paragraph of the Impoundment Notice as it existed at the outset of this litigation stated, "[f]ailure to claim an impounded vehicle within 15 days of the date of this notice may result in the sale or other disposition of the vehicle and its contents, as provided in Section 4-208 of the Illinois Vehicle Code."

In October of 2007,[3] the Impoundment Notice was revised in at least three respects. First, the fifteen day window in which an owner could claim her vehicle was changed to twenty-one days. Second, the instructions for securing the release of impounded vehicles were amended to state: "the registered owner or his authorized agent must appear at the pound location listed above and *claim the vehicle by presenting* (1) a certificate of title or current state license registration card documenting ownership and (2) a release order *receipt* which may be obtained *by paying all outstanding fines and penalties for parking and/or compliance violations and all immobilization, impoundment and storage fees*, at the Office of the Department of Revenue at any of the following locations" (italics used to show revisions). Third, the revised Impoundment Notice stated that "[t]he registered owner may request one extension of 15

_____

[3]Plaintiffs state that the Impoundment Notice had been revised "by January 7, 2008," citing a notice of that date that incorporates the revised language. An affidavit the City filed on May 10, 2010, states that the change was actually made in October of 2007. Since plaintiffs maintain that their claim does not depend on which language appeared in the Impoundment Notice, I can discern nothing that turns on the specific date of revision.

additional days before a vehicle is sold or disposed." Pl.'s SOF, Exh. F at RB000991.

The City does not attempt to acquire title to vehicles disposed of pursuant to its Policy prior to disposition. And the parties agree that regardless of any interest an owner may assert in an impounded vehicle, she must pay the City all fines, penalties, and fees arising out of delinquent parking tickets and the City's subsequent enforcement measures in their entirety to avoid disposition of the vehicle. In the event a vehicle owner believes her car was wrongly disposed of, she may, after the fact, file a claim for damages with the City Clerk's office.[4]

The foregoing description of the City's Policy is undisputed. It is likewise undisputed that the named plaintiffs' cars were disposed of pursuant to this Policy. In addition, the parties relate (or, in a few instances, I have gleaned from the record) the facts below, which are undisputed except where noted.

The Robledos

Plaintiffs recount that the Robledos were out of the country at the time their van was impounded on July 9, 2004. Although their adult son called the City in their absence, seeking information about the vehicle, he was told that the van would not be released to him. When Celso Robledo, upon his return, went to the City Department of

---

[4]Plaintiffs purport to dispute the City's statement asserting that vehicle owners can file a claim for monetary compensation, but, as discussed *infra* at 27, the dispute lacks factual support and is therefore properly disregarded.

Revenue on July 15, 2004, he tendered $400 and sought to enter into a payment plan for the remainder of the balance owing. The City accepted the $400 but declined to offer the Robledos a payment plan or to release the van. On or around the following day, the City sent a Notice of Impoundment to the Robledos, which contained the standard language used at that time, including that, "[f]ailure to claim an impounded vehicle within 15 days of the date of this notice may result in the sale or other disposition of the vehicle and its contents, as provided in Section 4-208 of the Illinois Vehicle Code." As far as the record shows, the Robledos had no further contact with the City regarding their impounded van. The Robledos' van was sold for approximately $150 on either July 31, 2004, or August 5, 2004 (the record is inconsistent, but the discrepancy is immaterial), pursuant to a contract between the City and United Towing.

In November of the same year, the City immobilized, towed, and impounded another vehicle belonging to the Robledos pursuant to the Policy. After the Robledos paid their entire parking ticket debt of $3,070--which did not include any credit for the value of the Robledos' previously sold van--on November 30, 2004, that vehicle was released.

The City, for its part, states that at the time Celso and Maria Robledo's impounded van was sold, they had accumulated a debt of $2,460 for unpaid final determinations of liability on approximately twenty-four uncontested tickets issued to them for a variety of infractions over the course of roughly thirteen-and-a-half years.

Celso Robledo received, but did not understand, the Impoundment Notice mailed to him on July 16, 2004. By the time their second vehicle was booted, towed, and impounded, the Robledos had received another ticket, on October 19, 2004. That ticket remained unpaid until the Robledos paid the entirety of their overdue ticket debt for the release of their second vehicle.

Walter Kopec

Plaintiffs relate the following episodes of Kopec's car saga: Kopec's car was booted on January 2, 2004, and was towed four days later, on January 6. That same day, Kopec went to the City's Department of Revenue, where he was given a document stating that he owed $910.[5] When Kopec returned to the Department of Revenue the following day prepared to pay the $910, he was told that he owed an additional $380, for a total of $1,290. Kopec testified that he again returned to the Department of Revenue "two or three days later," at which point he received a bill for $1,385.[6]

On January 20, 2004, Kopec went to the City Department of

---

[5]Plaintiffs' L.R. 56.1 statement of facts omits––presumably inadvertently––any reference to Mr. Kopec's January 6, 2004, visit to the Department of Revenue, skipping from the towing that day (set forth in paragraph 55 of plaintiffs' statement) to Mr. Kopec's "return" to the Department of Revenue "again" the "next" day (paragraph 56). The facts relating to his January 6, 2004, visit are supported by the record, however, and I have no reason to believe the City disputes them.

[6]Plaintiffs assert that Mr. Kopec returned on January 12, 2004, but defendants dispute this date, which indeed finds no support in plaintiffs' cited testimony. The City points to evidence to suggest that Mr. Kopec instead received the bill for $1,385 on January 21, 2004, the same day he was informed that the City had disposed of his vehicle.

Revenue to complain. An employee of that Department told Kopec that if he had a complaint, he should speak to a hearing officer, which Kopec did that same day. According to Kopec's testimony, he told the hearing officer, "the bill keeps going up on me. I can't handle this...I want to make a payment plan or an installment plan or am I eligible for amnesty," to which the hearing officer replied, "I can't help you with that. I'll note that you're here, but I can't do [anything] for you."[7] On January 21, 2004, Kopec returned to the Department of Revenue with $1,385 (by which date the City claims he actually owed $1,765), and was informed that the City had disposed of his vehicle.

The City asserts that Kopec accumulated and failed to pay thirteen final determinations of liability for parking tickets issued between April 14, 2001, and August 1, 2003. Kopec put the tickets he received into his glove compartment and did nothing further with them. He recalls receiving notices by mail periodically, but does not remember what he did with them. Kopec does not dispute that he owed the City the amounts stated on the notices, and he understands

---

[7]Mr. Kopec's testimony about his conversation with the hearing officer is inconsistent. Mr. Kopec first testified that he explained to the hearing officer that his car had been disposed of, and that the hearing officer replied, "if it's been disposed of, I can't help you with this matter." In the testimony cited above, however, Mr. Kopec seems to indicate that he met with the hearing officer before learning his car had been disposed of. In any event, although Mr. Kopec's testimony is less than crystal clear, it cannot reasonably be construed to support the proposition for which plaintiffs cite it, namely, that "because Kopec did not contest the parking tickets that led to the seizure of the car, the hearing officer deemed Kopec's request for an impoundment hearing withdrawn."

that if he had paid for the tickets as they were issued, his car would not have been towed.

The City also states that Kopec's ticket debt at the time his vehicle was impounded was based on four tickets issued when his vehicle had a temporary license plate, and nine tickets issued when it had a permanent license plate. A document Kopec received on January 7, 2004, (presumably at his second visit to the Department of Revenue) indicates that the additional $380 over the amount Kopec was informed the previous day was owing relates to the unpaid tickets Kopec was issued while his vehicle had the temporary license.

### Jeffrey Martin

Plaintiffs recount that Jeffrey Martin's vehicle was booted on July 28, 2004. A notice was affixed to the car stating that it would be towed if its owner did not pay the City for unpaid parking tickets, plus a $60 towing fee, within twenty-four hours. Martin's vehicle was actually towed on August 2, 2004. Martin spoke to someone from the City after his vehicle was booted but before it was towed and was informed that he needed to pay all outstanding tickets plus a boot fee before he could have the boot removed. At some point after Martin's car was impounded, Martin made a telephone call to a City office to ask whether he could pay the full amount of his ticket debt with a credit card. The person he spoke to informed him that his car had been disposed of.

The City states that between September 18, 2003, and July 26, 2004, Martin received nine parking tickets. He recieved a Vehicle

Seizure Notice dated July 8, 2004, informing him, *inter alia*, that "your vehicle(s) may be booted unless all fines and penalties are paid within 21 days," and further warning, in bold print, that "**Motorists with booted or towed vehicles may not participate in the general parking ticket payment plan.**" An Impoundment Notice dated August 4, 2004, was sent to Martin, but he does not recall if he ever received it. Martin also does not recall if he ever read the information provided on the back side of the notices he received prior to his car being booted. As to the notice affixed to his vehicle after it was immobilized, he testified, "I may have just read that your car has been booted, which is stating the obvious, and just stopped." On July 26, 2004, Martin received another ticket. By September of that year, Martin had accumulated $660 in unpaid ticket debt for five parking violations that had reached final determinations.

## II.

In what now seems like ancient history, the City moved to dismiss plaintiffs' due process claims, arguing that the Ordinance itself and the various notices issued pursuant to the Policy provided plaintiffs abundant notice that their vehicles could be disposed of for serial unpaid violations of the parking laws. After observing (correctly) that plaintiffs are presumed to know the law, *Staten v. Neal*, 880 F.2d 962, 966 (7th Cir. 1989), the City insisted that in fact, the Ordinance alone provides sufficient notice, since it "clearly states that if one accumulates three or more parking

tickets and does not pay them or successfully contest them, the consequence is that one's car may be booted, impounded, retained indefinitely or eventually sold or disposed of if the owner does not pay the tickets and other fees."  Def.'s 07/08/05 Mot. to Dismiss, Mem. in Support, 5.[8]  The City also argued that its Policy provided notice at each progressive stage of vehicle owners' right to be heard and to challenge "each and every one of the underlying factual predicates" to disposition.  *Id.*, 7.

Plaintiffs responded that the City could not rely on the text of the Ordinance as giving plaintiffs notice that their cars would be disposed of for failure to pay their outstanding ticket debt, since neither that text, nor the text of § 4-208 of the Illinois Vehicle Code, which the Ordinance incorporates by reference, says anything at all about paying outstanding tickets and fees.  Instead, both the Ordinance and the Illinois Code condition disposition on an owner's failure to "claim" her vehicle within an allotted period.[9] Plaintiffs insisted that "claiming" a vehicle is different from paying outstanding ticket debt, citing the Seventh Circuit's decision in *Lee v. City of Chicago*, 330 F.3d 456 (7th Cir. 2003).  Indeed, in *Lee*, the court analyzed the relevant provisions of the Illinois Code

_____

[8]In reply to plaintiffs' opposition, the City added, in a footnote, that in any event the "personalized" notices plaintiffs received also provided adequate notice of these consequences.

[9]According to plaintiffs' analysis, the Impoundment Notice was similarly defective because it merely parroted the language of the Ordinance.  *Id.*, 6.

and concluded that "reclamation" and "release" are two different concepts under the statute. *Id.* at 469. Observing that "[n]othing in [§ 4-207(a)] conditions reclamation upon the payment of towing and storage fees. Rather it is only the *release* of an owner's car that is conditioned upon payment of those fees," *id.* (original emphasis), the court went on to hold that "an owner may alleviate the threat of loss or destruction of his car by properly asserting entitlement to the vehicle even if he lacks the funds to arrange for the car's immediate release." *Id.* Plaintiffs argued that *Lee* "forecloses the City's disposal of a vehicle when the owner has "reclaimed" it by "asserting entitlement" to it, and that "due process requires that plaintiffs be allowed to show that they 'reclaimed' their vehicles within the meaning of § 4-207(a) of the Illinois Vehicle Code and, on this basis, argue that the City may not dispose of their vehicles." Pl.'s Opp., 10, 11.

The City replied that *Lee* was inapplicable, since that case turned exclusively on provisions of the Illinois Code, whereas here, the Ordinance is the relevant source of law. The City argued that the meaning of "claimed," as used in the Ordinance, is not coextensive with its meaning as used in the Illinois Code, and that in the Ordinance, "claimed" is merely a shorthand for "paying the immobilization, towing and storage fees...and all amounts, including any fines and penalties remaining due on each final determination for liability." Def.'s Reply, 6-7. I acknowledged the City's argument, but I ultimately agreed with plaintiffs that because the notice they

allegedly had prior to the disposition of their vehicles warned only of the disposition of "unclaimed" vehicles, and because that notice arguably suggested misleadingly--by reference to the provisions of the Illinois Code--that plaintiffs could "claim" their vehicles in some manner other than by paying the entirety of their ticket debt, they had stated a claim for a violation of procedural due process.[10]

But then the City revised the Impoundment Notice. Now (and at all times since at least the beginning of 2008), the Impoundment Notice clearly states what is required to "claim" an impounded vehicle: "presenting....a release order receipt which may be obtained by paying all outstanding fines and penalties for parking and/or compliance violations and all immobilization, impoundment and storage fees, at the Office of the Department of Revenue at any of the following locations. ..." Plaintiffs agree that the revised Impoundment Notice provides adequate notice to vehicle owners of the City's Policy. And so, it appeared, the notice issue was put to rest.

In plaintiffs' view, that is not correct. Plaintiffs continue to press their claim that the City's notice is constitutionally defective. They now take a different tack, however, insisting that although the Impoundment Notice gives adequate notice of what the

---

[10]I also concluded that the arguments the City raised relating to the availability of a hearing were not appropriate for resolution on a motion to dismiss. I thus held, without further analysis of the hearing issue, that plaintiffs' allegation that they were not given a forum at which they could present their objections to disposition also supported their claim of a due process violation.

City's Policy is, the Policy *itself* is unconstitutional. Why? Because it fails to provide adequate notice.

But if all agree that the various notices issued under the Policy provide adequate notice of what the Policy is (specifically including notice that the City's progressive penalty scheme for scofflaw vehicle owners culminates in the "sale or other disposition of the vehicle and its contents" if an owner fails to pay the entirety of her parking debt within a certain period), then what further notice does procedural due process require? According to plaintiffs' revised argument, due process requires the City to provide owners: 1) notice of their right to "assert their ownership interest in"[11] their vehicles (and thereby to prevent their disposition by the City); 2) the right to a hearing on this issue; and 3) a "merits determination about ownership." Pl.'s SJ Mem. at 12 (summarizing plaintiffs' now-operative theory and concluding that the Policy "violates plaintiffs' due process rights three times over.")

The City's answer to these arguments is as simple as it is ultimately persuasive: these are not procedural due process claims

---

[11]Plaintiffs studiously avoid the word "claim," presumably to avoid fostering the "misunderstanding" that their due process claim is grounded in state law. Curiously, the very footnote in which plaintiffs disclaim any reliance on state law dedicates no fewer than fourteen lines to an explication of how the Policy violates the Illinois Motor Vehicle Code. More recently, plaintiffs have explained their early reliance on state law as a "model of how a process should work," but insisted that it "is not the origin of the due process right." 02/03/2011 Hr'g Tr. at 14.

at all.  Moreover, the substantive rights plaintiffs assert do not exist.

Indeed, while plaintiffs' argument is superficially compelling, close analysis reveals that what they seek is not the procedural right to stand up and be heard to say "that car is mine" and corresponding notice of that right.  What they seek is to compel the substantive result that, having done so, the City may no longer dispose of their vehicles--or, at least, that it may not do so pursuant to its established Policy.  But this is not the province of procedural due process.  Although plaintiffs frame their claim in terms of the procedural right to vindicate a property interest, what they actually seek is an adjudication of the substantive scope of that right: specifically, the determination that as long as it is asserted, it "trumps" the City's authority to dispose of their vehicles under the Policy.[12]

This, however, is neither a procedural question, nor indeed a constitutional one.  Plaintiffs' claim is not dissimilar from the petitioner's due process claim in *Bennis v. Michigan*, 516 U.S. 442 (1996).  In *Bennis*, the plaintiff was a woman who shared ownership of her vehicle with her husband.  Unbeknownst to Mrs. Bennis, Mr. Bennis used the car as the situs for an unlawful encounter with a prostitute.  The car was abated pursuant to Michigan law, which

---

[12]Indeed, it is the act of asserting the right that carries significance in plaintiffs' analysis, not any evidence plaintiffs might seek to introduce at the hearing they claim is required.

provided that any "building, vehicle, boat, aircraft, or place used for the purpose of lewdness, assignation or prostitution...is declared a nuisance," and that all such nuisances were subject to abatement. 516 U.S. at 444 (quoting Mich. Comp. Laws § 600.3801). Mrs. Bennis claimed that her due process rights were violated under Michigan's statutory scheme because it did not provide an "innocent owner" defense to abatement. The Court observed that "the gravamen of petitioner's due process claim is not that she was denied notice or an opportunity to contest the abatement of her car; she was accorded both.... Rather, she claims she was entitled to contest the abatement by showing she did not know her husband would use it to violate Michigan's indecency law." *Id.* at 446. Likewise in this case, plaintiffs received ample notice of the City's Policy, as well as multiple opportunities to contest the "predicates to disposition," i.e., the appropriateness of each penalty imposed pursuant to the Policy's progressive scheme. Yet they claim that they were entitled to contest the disposition of their vehicles by showing that they did not intend to relinquish their ownership rights. *See* Pl.'s SJ Reply, 7 (a hearing to determine whether owner intends to assert or to abandon her property interests is "essential to what the City can constitutionally do with the vehicle[]").

In *Bennis*, the Court analyzed numerous cases in which innocent property owners' interests were forfeited pursuant to legal regimes that declined to recognize the owner's innocence as a substantive bar to forfeiture and concluded that "the Due Process Clause does not

17

protect [the petitioner's] interest against forfeiture by the government." 516 U.S. at 549. Consistent with these principles, the City may establish a regime of progressive penalties that culminates in the forfeiture of scofflaw vehicle owners' property rights, and it may decline to recognize such owners' eleventh-hour assertion of an ownership interest in the vehicles as a substantive bar to disposition under this regime. Just as the *Bennis* Court declined to "import[] a culpability requirement" into Michigan's abatement scheme, I decline to rewrite the Ordinance, which authorizes the City to dispose of vehicles whose owners have repeatedly ignored lesser civil penalties, by importing a requirement that the City ascertain, prior to disposition, that the owner intends to abandon her impounded vehicle. The vehicle owner's subjective intent at that juncture, like the fact of Mrs. Bennis's innocence under Michigan's abatement scheme, simply is not a factor that is relevant to whether the owner's interest may be extinguished pursuant to the Policy. The factors that *are* relevant--whether the vehicle owner has accrued multiple final determinations of the City's parking ordinances, and whether the owner has paid the civil penalties and costs associated with these violations--are all undisputedly issues on which plaintiffs had ample opportunity to be heard, and ample notice of each opportunity.

*Connecticut Dept. Of Public Safety v. Doe*, 538 U.S. 1 (2003) further supports the conclusion that the hearings the City provides are adequate. In *Doe*, the Supreme Court analyzed a state statute

requiring the creation and publication of a registry of convicted sex offenders. The law mandated the inclusion in the registry of all individuals convicted of certain offenses, regardless of whether they were currently dangerous. The plaintiff sued the state, claiming that due process guarantees entitled him to a hearing to prove that he was not currently dangerous before requiring him to register. The Court disagreed, concluding that because "the law's requirements turn on an offender's conviction alone-a fact that a convicted offender has already had a procedurally safeguarded opportunity to contest," *id.*, at 1164, a further hearing to establish a fact not material under the law would be a "bootless exercise." *Id.* at 1165. Likewise here, plaintiffs have had a procedurally safeguarded opportunity to contest each of the underlying elements supporting the disposition of their vehicles. The City need not provide an additional pre-disposition hearing to allow them to assert a matter immaterial to the City's authority to dispose of their vehicles under the applicable legal regime.

Plaintiffs nevertheless insist that "the City cannot extinguish plaintiffs' property interest legislatively." Their leading case in support of this argument is *Youakim v. McDonald*, 71 F.3d 1274 (7th Cir. 1995). *Youakim* involved legislation enacted by the State of Illinois that imposed a requirement that homes providing foster care to relative children be licensed if the homes wished to receive state childcare benefits. Prior to the legislation, only homes providing

foster care to non-relatives were required to be licensed. Although homes caring for relative children were eligible to be licensed, the majority were not licensed, largely for reasons attributable to the State. Instead, these homes were designated as "approved," which meant that although they were not formally licensed, they were deemed to meet Illinois' licensing standards. Accordingly, they were eligible, for the four-year effective period of the "approved" designation, to receive state benefits. The new legislative regime eliminated the "approved" category and mandated the termination of benefits previously paid to "approved" homes by a certain date, prior to the expiration of the four-year "approved" period, without affording these homes an adequate opportunity to become licensed. The court concluded that although the State was entitled to add a new eligibility requirement, it could not, consistent with due process, eliminate benefits to homes it had previously deemed eligible without affording them the opportunity to become licensed.

Plaintiffs' reliance on *Youakim* is misplaced. In that case, the very terms of the legislation effected the extinction of the plaintiffs' property interest, regardless of any act or omission by the plaintiffs. There was no process at all by which the plaintiffs could have preserved their rights. By contrast, neither the City's Policy, nor the Ordinance from which it derives its authority, effects a *per se* forfeiture of plaintiffs' interest in their vehicles. Instead, the Ordinance establishes a regime for the enforcement of the City's parking regulations, under which vehicle

owner's interest is gradually eroded, and then ultimately extinguished, after he repeatedly violates the City's regulations and repeatedly fails to pay (or successfully to contest) the penalties associated with those violations. The City does not, as plaintiffs argue, "legislate out of existence plaintiffs' property interest in their vehicles." Pl.'s Reply, 2. It was plaintiffs' own neglect that brought about this result. However draconian plaintiffs may find the final penalty in the City's legislative regime, they were not entitled to ignore the lesser penalties for which they had been determined (through concededly adequate process) to be finally liable. Having done so, they cannot be heard to complain that they lacked notice of, or had no opportunity to avert, the consequences of their own lawlessness.

Indeed, none of the cases plaintiffs cite in which the court found a due process violation involved a property deprivation effected pursuant to a state or local government's authority to impose civil penalties for conduct it seeks to discourage. In addition to *Youakim*, plaintiffs rely on *Logan v. Zimmerman Brush Company*, 455 U.S. 422 (1982), and *Bennett v. Tucker*, 827 F.2d 63 (7th Cir. 1987), both of which addressed the state's deprivation of an individual's property interest in his legal claim.[13] In these

_____

[13]Plaintiffs cite a number of other authorities to support various portions of their due process argument; but none ultimately found a due process violation in the context of a property deprivation resulting from the government's legitimate law enforcement activities. One of the cases plaintiffs cite in passing, *Coleman v. Watt*, 40 F.3d 255, 260-61 (8th Cir. 1994),

cases, the state violated due process by finally extinguishing the plaintiffs' discrimination claims as a result of the state's unilateral failure to act on them. Here, as noted above, it was *plaintiffs'* failure to act in response to the City's concededly legitimate exercise of authority that ultimately eviscerated their property interest. At least one court has affirmatively found that the government does not violate due process when it disposes of an owner's vehicle in this context. *Tate v. District of Columbia*, 601 F. Supp. 2d 132, 137-38 (D.D.C. 2009).

Plaintiffs' treatment of the familiar *Eldridge* analysis--and in particular of its second prong--reveals just how strained their due process argument is. In *Mathews v. Eldridge*, 424 U.S. 319 (1976), the Court established a three-prong test for evaluating what process is due when the government effects a deprivation of a protected property interest. *Eldridge* requires courts to balance: "first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id*. at 335.

which plaintiffs quote as additional support for the limited proposition that their interest in their vehicles was important, declined to dismiss a due process claim in an arguably similar context, but that decision did not reach the merits of the claim.

While the City's apparently novel argument that plaintiffs' residual property interest in their cars, by the time they have foregone their possessory interest through their own neglect, should not be considered "important" is not without appeal, several courts, including the Seventh Circuit, have held that a vehicle owner's interest in her car is important. *Miller v. City of Chicago*, 774 F.2d 188, 192 (7th Cir. 1985); *Towers v. City of Chicago*, 979 F. Sup. 708 (N.D. Ill. 1997). Accordingly, I conclude that the law is with plaintiffs on the first *Eldridge* factor. Thereafter, however, plaintiffs' analysis goes south.

Plaintiffs begin their treatment of the second factor--the "risk of erroneous deprivation"--straightforwardly enough, with the unassailable principle that the deprivation of property "must be preceded by notice and an opportunity for hearing *appropriate to the nature of the case*." Pl.'s SJ Mem., 10 (quoting *Mullane v. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950) (plaintiffs' emphasis). Where plaintiffs' argument begins to unravel is with their next assertion: "[w]hen the notice and an opportunity for a hearing is not appropriate to the nature of the case, the resulting deprivation is erroneous." In other words, plaintiffs define an "erroneous" deprivation as one that lacks the appropriate procedural safeguards. But this circular definition clearly is not what the Court contemplated in *Eldridge*, where the "erroneous" deprivation was the termination of the plaintiff's disability payments despite his

23

alleged ability to prove, if given an adequate hearing, that he met the substantive eligibility criteria. *Frier v. City of Vandalia, Illinois*, 770 F.2d 699, 707 (7th Cir. 1985), another case cited by plaintiffs, confirms that whether a deprivation is "erroneous" is a substantive, not a procedural question. *Id.* ("Whether an individual violates this ordinance requires an assessment of fault and the credibility of witnesses, issues which the Supreme Court has indicated are too likely to be resolved erroneously in the absence of the extensive procedural safeguards that attend trial-type hearings.")

The remainder of plaintiffs' meandering discussion of the second *Eldridge* factor has equally little mooring in *Eldridge* itself. The City's response seems to infer that plaintiffs' challenge is to the City's substantive determination of ownership, but that is not the position that emerges from plaintiffs' argument. The trouble for plaintiffs, of course, is that the deprivation of their property interest was *not* substantively "erroneous." That is, the City did not apply the Ordinance erroneously as a result of defective process; it applied the Ordinance *correctly*, pursuant to its substantive terms. Plaintiffs simply argue, as discussed above, that those terms should be different. In short, the second *Eldridge* factor resoundingly favors the City.

The third *Eldridge* factor also favors the City. As discussed above, the City's process undisputedly provided plaintiffs ample

notice and opportunity for a hearing on all of the substantively relevant factors. Because the additional issue on which plaintiffs seek to be heard would not affect the City's authority to dispose of plaintiffs' vehicles, any additional burden on the City to provide such a hearing would be undue. Moreover, the City raises legitimate concerns about the additional fiscal and administrative costs of pursuing plaintiffs' proposed course of action, which would involve not only additional storage time, but also the time- and resource-consuming steps of obtaining judicial liens on plaintiffs' vehicles. Especially given that taking on these additional burdens would not change the substantive result, the City has a strong interest in avoiding them.

For the foregoing reasons, the City's motion for summary judgment of plaintiffs' due process claim is granted.

### III.

I now turn to plaintiffs' state law claims, which require comparatively little analysis. Plaintiffs first assert an inverse compensation claim, arguing that the City's sale of their vehicles without crediting the sale proceeds against their fines and fees amounts to a taking in violation of the Illinois Constitution and the Illinois Eminent Domain Act. The City argues, *inter alia*, that this claim should be denied as premature because plaintiffs have not sought, and been denied, compensation from the City through the claims process the City provides. "If the government has provided an adequate process for obtaining compensation, and if resort to that

process yields just compensation, then the property owner has not claim against the Government for a taking." *Beverly Bank v. Illinois Department of Transportation*, 579 N.E.2d 815, 823 (Ill. 1991). Plaintiffs purport to dispute that the City provides plaintiffs an "adequate" process for obtaining compensation, but this dispute is not supported by the record. In its L.R. 56.1 statement, the City asserts, "[t]he City allows owners who believe their vehicles were wrongly disposed of to file a claim for monetary compensation with the City Clerk's office [citation to exhibits]. The Robledos and Martin have not filed such a claim at all, and while Kopec purported to fill out the claim form, he did not do so properly. [citation to exhibits]." The evidence the City cites, which includes, *inter alia*, Section 2-12-060 of the Municipal Code of Chicago, directing the city clerk to forward to the city council all claims brought against the City by members of the public, and a copy of a form letter from the city clerk's office, instructing claimants on how to use the claims procedure, generally supports the City's factual assertions. Plaintiffs' one word response is "Disputed." It is axiomatic, however, that naked denials are insufficient to controvert an adverse party's properly supported L.R. 56.1 statement. *See, e.g.*, *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill. 2000) ("[f]actual allegations not properly supported by citation to the record are nullities").

In their reply, plaintiffs argue that they lack an "adequate" process for obtaining compensation, since the City's process only

provides for compensation upon a showing that plaintiffs' vehicles were wrongly towed--a claim plaintiffs do not make. At the outset, it is not clear that this argument supports the conclusion that plaintiffs lack an adequate process, rather than the conclusion that their claim against the City fails on the merits. But I need not resolve this question, since even assuming plaintiffs' legal argument has legs, it lacks support in the factual record. Accordingly, I deny their inverse condemnation claim.[14]

And plaintiffs' bailment claim clearly fails on the merits. "A bailment is the delivery of property for some purpose upon a contract, express or implied, that after the purpose has been fulfilled, the property shall be redelivered to the bailor, or otherwise dealt with according to his directions, or kept until he reclaims it." *American Ambassador Casualty Co. v. City of Chicago*, 563 N.E.2d 882, 884 (Ill. App. Ct. 1990). Plaintiffs proceed on a "constructive bailment" theory, under which they must identify undisputed facts showing that the City held their vehicles "under circumstances whereby [it] ought, under principles of justice, to keep [the vehicle] safely and restore it or deliver it to the owner... ." *Id.* (alterations in plaintiffs' citation, Pl.'s Reply, 19). This is an awkward theory, however, in view of fact that the

_____

[14]The City has not moved for summary judgment of plaintiffs' state claims. Nevertheless, the factual record and the parties' respective arguments on the viability of these claim is sufficient for me to conclude that the City is entitled to judgment on these claims.

City explicitly announces, in the Impoundment Notice, that it may sell or otherwise dispose of vehicles whose owners do not claim them by paying all outstanding parking fines and penalties by a particular date. On these facts, no vehicle owner could reasonably infer an "agreement, express or implied" that the City would keep his car safe beyond that date. 563 N.E.2d at 881. Indeed, none of plaintiffs' cited authorities supports finding a constructive bailment in this context.

IV.

For the foregoing reasons, the City's motion for partial summary judgment is granted, and Plaintiffs' motion for summary judgment is denied.

**ENTER ORDER:**

_____
**Elaine E. Bucklo**
United States District Judge

Dated: April 6, 2011